Submitted October 31, 2011, reversed and remanded August 8, 2012

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

WADE OWEN KENTOPP,
*Defendant-Appellant.*

Jackson County Circuit Court
094119FE; A145415

284 P3d 564

Peter Gartlan, Chief Defender, and David Sherbo-Huggins, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Karla H. Ferrall, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

ARMSTRONG, P. J.

**ARMSTRONG, P. J.**

Defendant appeals a judgment of conviction for unlawful possession of methamphetamine, ORS 475.894, arguing that the trial court erred in denying his motion to suppress evidence obtained during an unlawful extension of a lawful traffic stop. Reviewing the denial of the motion to suppress for legal error and deferring to the trial court's findings of historical fact if there is evidence to support them, *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993), we conclude that the evidence should have been suppressed, and, accordingly, we reverse and remand.

While he was sitting in his patrol car in the median of Interstate 5, Oregon State Trooper Jeter saw defendant driving a car without wearing his seatbelt and decided to stop him. Jeter caught up to defendant and turned on his patrol car's overhead lights. As defendant began pulling onto the shoulder of the road, Jeter could see him leaning over toward the floorboard by his feet. After the vehicles had stopped on the shoulder, Jeter approached defendant's car on the passenger side to tell defendant why he had stopped him. Almost immediately upon looking in the open passenger-side window, Jeter saw a small cosmetic purse by defendant's feet—where Jeter had seen defendant reaching while he was being pulled over. As Jeter began talking with him, defendant began visibly shaking, which struck Jeter as unusual. Jeter also noticed during the conversation that defendant had gray, rotting teeth, which Jeter associated with methamphetamine use.

Jeter eventually asked defendant for his driver's license, and defendant told him that he had left it at home and also that, because he was borrowing the car from his boss, he did not have any registration for the car or proof of insurance. In response, Jeter asked if he had any form of identification, but defendant said that he did not and, instead, told Jeter his name and birth date. He also gave Jeter his boss's name and telephone number, so that Jeter could call him to verify that defendant had permission to borrow the car, and informed Jeter, in response to his questioning, that the cosmetic purse belonged to his boss's wife.

At that point in the traffic stop, Jeter returned to his patrol car, requested a backup officer, and provided dispatch with defendant's name and birth date so that dispatch could run a "wants [check], [a] DMV check and a criminal history" on defendant. After calling dispatch, Jeter walked back to the passenger-side window of defendant's car and asked defendant if he would step out of the car and talk with him. Defendant agreed to get out of the car, but he began to roll the windows of the car up—with, according to Jeter, a panicked look on his face—and reached for the keys of the car. That caused Jeter to suspect that defendant was either going to lock himself in the car or that defendant was going to flee from the scene. Acting on his suspicion, Jeter quickly went to the driver-side door, which was slightly open, and put his leg against it. He told defendant that he thought defendant was up to something and asked for the car keys. Defendant refused to give him the keys, but Jeter took them out of defendant's hand anyway. Jeter and defendant then had a brief conversation at the car.[1]

After that conversation, and about 15 minutes into the stop, the backup officer, Oregon State Trooper Costanzo, arrived. Costanzo helped escort defendant to the front of Jeter's patrol car and stood nearby while Jeter patted defendant down for weapons and administered *Miranda* warnings to him.

Jeter, having failed to find any weapons on defendant, asked him whether there were drugs in the car, and defendant responded, "Not that I know of." Defendant's response caused Jeter to request defendant's consent to search the car, but defendant refused. At that point, Jeter told Costanzo that defendant was not going to consent to the search, and Costanzo returned to his patrol car and retrieved his drug-sniffing dog from the back seat. As Costanzo was preparing to conduct a drug sniff around the car with the dog, Jeter told defendant that, if the dog alerted to his car, then the officers would search it. Shortly thereafter, the dog alerted to the driver's side of the car, leading Jeter to handcuff

---

[1] During the conversation, defendant told Jeter that he intended to lock Jeter out of the car because he had heard that that was the appropriate thing to do when a person is asked to get out of his or her vehicle by a police officer.

defendant—at which time defendant told him that there was a baggie of methamphetamine in the cosmetic purse that Jeter had seen. Jeter told Costanzo about defendant's admission, and Costanzo proceeded to search the car and found methamphetamine and drug paraphernalia.

Jeter cited defendant and released him—roughly 30 minutes after he had pulled defendant over—and called defendant's boss to ensure that the car was not stolen.[2] Subsequently, the state charged defendant with one count of unlawful possession of methamphetamine.

Before trial, defendant moved under Article I, section 9, of the Oregon Constitution to suppress the drug evidence and his statement to Jeter that the purse contained methamphetamine.[3] In support of his motion, defendant contended, among other things, that Jeter had unlawfully extended the traffic stop when, rather than pursuing the initial traffic violation—*viz.*, failing to wear a seatbelt—he began to investigate whether defendant possessed drugs without reasonable suspicion that he did.

The court denied the motion, concluding that,

"from the totality of the circumstances of all the factors, including the fact that * * * [defendant] did not have registration or insurance, indicated it was not his car, did not have a driver's license, obviously [Jeter] had reasonable suspicion that he was committing the crime of failing to carry or present a driver's license. And that his demeanor, the furtive movements and the situation with the teeth, that all the things that * * * Jeter mentioned * * * and the totality justified a reasonable suspicion that a crime had occurred and that the defendant had committed it and, therefore, the extension of the stop was valid."

Shortly thereafter, defendant entered a conditional guilty plea, reserving his right to appeal the court's denial of his suppression motion, and was convicted.

---

[2] Defendant did have his boss's permission to drive the car.

[3] Defendant also invoked the Fourth Amendment to the United States Constitution as legal authority for his suppression motion, but he does not renew his federal constitutional argument on appeal.

On appeal, defendant focuses, among other things, on a purported inadequacy of the record—*viz.*, the lack of specific evidence about when Jeter received the results of defendant's records check from dispatch—and argues that this case should be remanded for a factual determination of when that happened. Moreover, defendant contends, in essence, that, if the state cannot prove that the officers' drug investigation occurred before Jeter received dispatch's response—and thus during an unavoidable lull in the traffic stop—then the state will have failed to prove that the officers acted lawfully in conducting the drug investigation. In response, the state proceeds from the premise that the traffic stop had been extended by the drug investigation and argues that the extension of the stop was lawful because Jeter had reasonable suspicion that defendant was not licensed to drive, had stolen the car that he was driving, and was about to flee the scene.[4] Therefore, as framed by the parties' arguments at the suppression hearing and on appeal, the determinative issue in this case is whether the extension of the lawful traffic stop caused by Jeter's unrelated drug inquiry was justified by reasonable suspicion.[5]

---

[4] We note that the state incorrectly frames the relevant inquiry in this case as including whether the extension of the traffic stop was justified by Jeter's reasonable suspicion that defendant was not licensed to drive. Because Jeter had all of the information that he needed to determine whether defendant was licensed to drive when he received the results of defendant's records check, which included a DMV check, Jeter would not have needed to extend the traffic stop to pursue his reasonable suspicion on the matter.

[5] Defendant requests that we remand this case to the trial court to determine when Jeter heard back from dispatch, apparently based on the premise that any inquiries unrelated to the traffic stop after that point would not have occurred during an "unavoidable lull" and, therefore, would have to be justified by reasonable suspicion. *See State v. Rodgers*, 219 Or App 366, 372, 182 P3d 209 (2008), *aff'd sub nom State v. Rodgers/Kirkeby*, 347 Or 610, 227 P3d 695 (2010) (officer conducting a traffic stop may inquire about matters unrelated to the stop during an unavoidable lull in the stop).

There is no need for us to do that. The trial court concluded that Jeter's unrelated inquiry about drugs was an extension of the traffic stop that was justified by reasonable suspicion. Thus, the trial court implicitly rejected the premise that the unrelated inquiry occurred during an unavoidable lull and, therefore, was not an extension of the traffic stop. Moreover, the state did not argue below, and does not argue on appeal, that it carried its burden of proving that Jeter's unrelated inquiry about drugs occurred during an unavoidable lull in the traffic stop. *See State v. Dennis*, 250 Or App 732, 737, 282 P3d 955 (2012) (setting out state's burden).

The reasonable suspicion standard has a subjective component—that is, the officer must subjectively suspect that a person has committed a crime—and an objective component—that is, the officer must identify specific and articulable facts from which he or she formed an objectively reasonable suspicion that a person has committed or is about to commit a crime. *State v. Mitchele*, 240 Or App 86, 90-91, 251 P3d 760 (2010). Here, because Jeter testified that he suspected that defendant was engaged in criminal activity, the reasonable suspicion inquiry hinges on the objective prong of the test: whether the specific and articulable facts in this case—*viz.*, defendant's (1) furtive movements; (2) nervous demeanor; (3) gray, rotting teeth; (4) conduct consistent with trying to flee the scene; (5) failure to have registration and proof of insurance for the car that he was driving; and (6) statement that he was borrowing the car from another person—are sufficient to support a reasonable suspicion that defendant was committing the crime of drug possession.

We begin with the first three circumstances. As to defendant's furtive movements, those movements—*viz.*, leaning down as he was being pulled over—do not, by themselves, amount to reasonable suspicion. *See, e.g., State v. Berry*, 232 Or App 612, 618, 222 P3d 758 (2009), *rev dismissed*, 348 Or 71 (2010) (concluding that the defendant's furtive movements toward her car's center console, as the officer approached the car, "do not by themselves justify reasonable suspicion"). The other two facts—defendant's nervous demeanor and gray, rotting teeth—could arguably have led Jeter to believe that defendant had used drugs in the past. However, an officer's observation of signs of a person's past drug use does not, by itself, give rise to reasonable suspicion that the person currently possesses drugs. *State v. Frias*, 229 Or App 60, 65, 210 P3d 914 (2009). Specifically, as to defendant's nervous demeanor, it could be ascribed to "any number of things"—especially in light of the fact that Jeter did not testify that defendant's nervousness during the stop suggested to him that defendant had recently used drugs—thereby further undermining the value of that circumstance as support for reasonable suspicion of drug possession. *See State v. Holdorf*, 250 Or App 509, 514, 280

P3d 404 (2012). As to defendant's gray, rotting teeth, we have previously concluded that physical indications that were far more consistent with past drug use—for example, in *State v. Holcomb*, 202 Or App 73, 77, 121 P3d 13, *modified on recons*, 203 Or App 35, 125 P3d 22 (2005), track marks on the defendant's arms—failed to give rise to reasonable suspicion of drug possession.

Not only do those circumstances individually not amount to the relevant reasonable suspicion, we also conclude that, even considering them together, they are insufficient to give rise to reasonable suspicion that defendant possessed drugs.

That leaves the facts that, according to the state, justified Jeter's extension of the traffic stop because they amount to reasonable suspicion that defendant had committed or was about to commit crimes *other* than drug possession—*viz.*, theft of the car and attempting to elude a police officer. However, even if the state were correct that those circumstances amount to reasonable suspicion of those crimes, we do not agree that the officers' reasonable suspicion of those crimes also justified the extension of the traffic stop to investigate a crime for which the officers did *not* have reasonable suspicion—*viz.*, drug possession.

We reached the same conclusion in *State v. Klein*, 234 Or App 523, 228 P3d 714 (2010). In *Klein*, the defendant was stopped for various traffic violations that he had committed while riding his bike. After the officer who stopped the defendant had run a records check on the defendant in his patrol car and had received the results of the records check, the officer returned to the defendant and noticed that he had a number of keys hanging from his bicycle, which the officer believed were burglary tools— possession of which is a crime under ORS 164.235. The officer then asked the defendant whether he had any drugs. The defendant responded negatively, and the officer asked him about the keys. After the defendant explained why he had the keys, the officer continued asking the defendant about his potential drug possession until the defendant admitted that he had a small amount of methamphetamine

on him. The defendant eventually consented to be searched, and the officer found the drugs.

On the defendant's appeal from the trial court's denial of his suppression motion, we determined that, at the point that the officer had the results of the defendant's records check, the officer had all of the information that he needed to complete the traffic stop and, therefore, the officer needed reasonable suspicion to lawfully extend the stop to ask the defendant about the drugs. *Id.* at 531-32. We subsequently concluded that the officer did not have that reasonable suspicion, reasoning that the officer

> "had a reasonable suspicion that [the] defendant possessed burglary tools ***. That suspicion gave [the officer] sufficient justification to inquire *about the keys*, which he did. However, after getting an answer to his question about the keys, [the officer] returned to questions about drugs without, again, a reasonable suspicion to believe that [the] defendant possessed them. That inquiry, on matters about which [the officer] did not have reasonable suspicion, unconstitutionally extended the duration of the stops as to either the traffic offense or unlawful possession of burglary tools."

*Id.* at 532 (emphasis in original). Hence, an officer's reasonable suspicion about certain crimes *does not justify* the officer's extension of a stop to conduct an investigation of another crime for which the officer does not also have reasonable suspicion. Similarly to *Klein,* in this case, rather than pursuing an investigation of the crimes for which he may have had reasonable suspicion, Jeter extended the traffic stop to conduct an unrelated investigation of whether defendant possessed drugs without reasonable suspicion related to the subject of that investigation.

In sum, we conclude that Jeter did not have reasonable suspicion that defendant possessed drugs and, therefore, Jeter's question about drugs and the ensuing drug investigation unlawfully extended the traffic stop in violation of Article I, section 9. Defendant's admission that he possessed drugs was a product of that illegality, and, accordingly, his admission and the drug evidence that the

officers found during the search based on his admission must be suppressed.[6]

Reversed and remanded.

---

[6] On appeal, the state does not raise an argument that the evidence should not be suppressed under an inevitable discovery or independent source theory.